JS-6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:26-cv-00400-MEMF-MBK |
| Plaintiff, | ORDER GRANTING CERTIFICATE OF EXTRADITABILITY |
| v. | |
| EDWIN PASCUAL SANABRIA DE LA TORRE, | |
| Relator. | |

The United States seeks a certificate of Edwin Pascual Sanabria de la Torre's extraditabilty to the Republic of Peru pursuant to 18 U.S.C. § 3184. In 2017, a Peruvian court found Sanabria guilty of the murder of his sister, Olga Eugenia Sanabria de la Torre, and sentenced him to twenty years in prison. Sanabria was present for the trial hearings in his case, but fled Peru shortly before the court issued its judgment of guilt. His conviction and prison sentence were upheld on appeal. On August 16, 2023, Peru submitted a diplomatic note requesting Sanabria's extradition from the United States.

Sanabria was arrested by the United States Marshals in Lake Forest, California, on December 3, 2025. The United States filed a motion for a

certificate of extraditability on January 29, 2026. After the completion of briefing, the Court held an extradition hearing on June 5, 2026. For the reasons that follow, the Court grants the United States' motion and issues a certificate of Sanabria's extraditability to the Secretary of State.

## I.   FACTUAL AND PROCEDURAL HISTORY

### A. Factual Background

The instant extradition request arises from Sanabria's conviction for the murder of his sister, Olga Eugenia Sanabria de la Torre ("Olga Sanabria"), in 2012. On April 5, 2017, following a trial, the Court of Appeals of Northern Lima, Second Criminal Division Specialized in Proceedings with Non-Incarcerated Defendants (the "Northern Lima Court of Appeals"), issued a judgment finding Sanabria guilty of Aggravated Murder for Financial Gain. The Supreme Court of Justice of the Republic of Peru ("Supreme Court of Justice") affirmed Sanabria's conviction on August 21, 2018. The following factual summary is drawn from the written decisions of the Northern Lima Court of Appeals and the Supreme Court of Justice, as well as investigative files from the case, which Peru provided in support of its extradition request. Dkt. 22-1 at 2.

The Sanabria family owned and operated the San Marcelo Educational Institution, which has multiples campuses in Lima, Peru. In or around 2009, Sanabria's and Olga Sanabria's mother passed away and left most of her business property to Olga Sanabria, including the educational facilities of San Marcelo's San Martín de Porres campus, as well as shared ownership of a campus in Callao with Sanabria. Dkt. 22-3 at 321, 258-59, 349.

At the time of her mother's passing, Olga Sanabria was married and living with her family in Valencia, Spain, where she had resided for the past

approximately twenty years. She subsequently returned to Lima to run the schools. *Id.* at 40, 317, 325, 349. Evidence presented at trial indicated that Sanabria and his sister's relationship had deteriorated during her time abroad and worsened when she returned to Peru. *Id.* at 317, 321, 351, 384. According to colleagues and Olga Sanabria's husband, Olga Sanabria had constant conflicts with Sanabria and his wife, Nany Reaño Vásquez, who also worked at the school. *Id.* at 366, 350-51, 523-26. Olga Sanabria ultimately required Ms. Vásquez to resign her position. *Id.*

On March 1, 2012, Olga Sanabria attended a training at the San Martín de Porres campus. *Id.* at 47, 193, 196, 318. Sanabria was not present at the school. According to evidence presented at trial, Sanabria and his wife called the principal of the school, who was present at the training, multiple times to inquire about the timing and location of the training. They also specifically asked what clothing Olga Sanabria was wearing and what time she would be leaving the event. *Id.* at 59, 345, 388. Separately, on the day of the training, Sanabria placed a call to request that the school's security guard assist with a project at a different school campus. The guard complied, leaving the door to the school unattended. *Id.* at 357, 366, 511.

At approximately 1:15 p.m., a man entered the school campus and shot Olga Sanabria three times in her thorax and abdomen. She later died from her wounds. *Id.* at 106, 287, 357, 382, 507.

According to the subsequent investigation by law enforcement authorities, Sanabria had planned the murder of his sister with his wife and their long-time housekeeper, Rose Mitma. Mitma worked with other individuals, including Yolanda Sara Borja Zavaleta and Jorge Luis Poves Paucar, to hire a hitman and supplied him with a cellular telephone. *Id.* at 616-17. In exchange for Mitma's assistance, Sanabria extended the payment

3

terms of a loan that Mitma's family owed him, valued at approximately $13,800. *Id*. at 368, 394, 542-43.

At trial, the prosecution introduced telephone records as evidence of the conspiracy between Sanabria, Reaño Vásquez, Mitma, Borja Zavaleta, and Poves Paucar. The records showed that, between February 3, 2012, and March 1, 2012, numerous telephone calls took place between the telephones believed to be used by Mitma, Sanabria, and Reaño Vásquez. *Id*. at 146-148, 371-72, 616-17. Among other calls, the records showed that the telephone believed to be used by Mitma called the telephone believed to be used by Sanabria minutes before Olga Sanabria's murder. *Id*. at 332, 369. The prosecution identified a telephone believed to be used by the hitman, based on cell site records placing the telephone in the area in which the crime took place. The telephone records showed that the telephone believed to be used by Mitma had exchanged calls and text messages with the telephone believed to used by the hitman immediately prior to, and directly after, Olga Sanabria's shooting. *Id*. at 11, 162-64, 200, 289, 371-72, 391-92, 540-42, 616-17.

Following Olga Sanabria's death, Sanabria became the exclusive operator of the San Marcelo Educational Institution. According to evidence introduced at trial, Sanabria substantially increased his own salary and also re-hired his wife, Reaño Vásquez, who was given a significantly higher wage than she had previously earned before she resigned her position. *Id*. at 264, 531-32. Sanabria also transferred part of his ownership stake in the school to his father-in-law and hired other members of Reaño Vásquez's family. *Id*.

## B. Sanabria's Trial and Appeal

On October 23, 2012, the Sixth Provincial Prosecutor's Office Specialized in Criminal Proceedings in and for Northern Lima issued a formal complaint charging Sanabria, Reaño Vásquez, Mitma, Borja Zavaleta, and

4

Poves Paucar, with Murder and Aggravated Murder for Financial Gain, in violation of Sections 106 and 108 of the Criminal Code. *Id*. at 88-103.

On December 10, 2012, the Northern Lima Court of Appeals issued an order committing the case for trial. *Id*. at 104-19. The court permitted the defendants to remain out of custody during the trial proceedings subject to certain conditions, including a prohibition on leaving the country. *Id*. at 115-16. Hearings took place in the criminal trial on June 27, 2016, and November 25, 2016, at which the court heard witness testimony and other evidence. *Id*. at 218-85. Sanabria was present for these trial court proceedings. *Id*. On March 30, 2017, Peruvian migratory records reflect that Sanabria departed Peru for Mexico. *Id*. at 438. There is no record that he has returned to Peru since that time. *Id*.

On April 5, 2017, the Northern Lima Court of Appeals issued a written decision and judgment in the criminal case. *Id*. at 286-405. The decision summarizes in detail the charges brought against the defendants and the evidence presented at trial. Based on its conclusions of fact and law, the Northern Lima Court of Appeals found Sanabria and Mitma guilty of Aggravated Murder for Financial Gain. *Id*. at 364-89. The court characterized Sanabria as the "mastermind" of the crime and Mitma as his "primary accomplice," and rejected that Sanabria should be found liable as an "aider and abettor." *Id*. at 396-97. The court, however, found insufficient evidence to convict Reaño Vásquez, Borja Zavaleta, and Poves Paucar, and acquitted them of the murder. *Id*. at 378-79, 402. The court sentenced Sanabria and Mitma to 20 years in prison without possibility of parole and imposed civil restitution of 100,000 soles, significantly more than the 15,000 soles sought by the prosecution. *Id*. at 398-404. On the day after it issued its judgment, April 6, 2017, the Northern Lima Court of Appeals issued a letter requesting

Sanabria's arrest and extradition. *Id*. at 406-20.

Although Sanabria remained abroad, he subsequently appealed his sentence and conviction to the Supreme Court of Justice. On August 21, 2018, the Supreme Court of Justice issued a written decision addressing Sanabria's appeal, as well as the appeals of other parties in the criminal case. *Id*. at 505-50. The Supreme Court of Justice found that Sanabria's conviction and sentence were "duly justified . . . the evidence is sufficient, and it categorically proves his criminal responsibility." *Id*. at 520-38. However, the court "clarified," that under Peruvian criminal law, Sanabria should have been found liable as an "aider and abettor," rather than "mastermind." *Id*. at 547-48. It made clear, though, that this correction did not affect the validity of the conviction or sentence. *Id*. at 547 ("the factual situation is the same, the charges against him also"). The Supreme Court of Justice further found that it was impermissible to impose a civil restitution order greater than the amount requested by the prosecution. *Id*. at 547-48. Accordingly, the court concluded that there were no grounds to annul Sanabria's conviction, but ordered that the civil restitution award be reduced to 15,000 soles. *Id*. at 548-49. In its decision, the Supreme Court of Justice also affirmed Mitma's conviction, reversed the acquittals of Reaño Vásquez and Borja Zavaleta, and ordered new trials for Reaño Vásquez and Borja Zavaleta. *Id*.

On April 23, 2019, the Court of Appeals for Northern Lima issued a final judgment consistent with the Supreme Court of Justice's decision. *Id*. at 551-54. With respect to Sanabria, the court acknowledged that the "correct characterization of the facts was aider and abettor," but that "there are no grounds for annulment to the extent that [Sanabria] is sentenced as a primary accomplice." *Id*. at 552.

**C. Extradition Request and Proceedings in the United States**

On August 16, 2023, Peru submitted a diplomatic note formally requesting Sanabria's extradition. Dkt. 22-1 at 2, 18.

On November 24, 2025, the United States filed a Complaint for Arrest Warrant and Extradition for Sanabria. Dkt. 1. After Magistrate Judge Rozella A. Oliver issued an arrest warrant, (Dkt. 3), the United States Marshals arrested Sanabria in Lake Forest, California, on December 3, 2025. Dkt. 6, 8. Sanabria made his initial appearance before the undersigned Magistrate Judge on December 4, 2025. Dkt. 9. The Court found no special circumstances warranting Sanabria's release pending extradition proceedings and ordered his continued detention. Dkt. 12.

On January 14, 2026, the United States filed its Request for Extradition, with accompanying exhibits. Dkt. 16; *see also* Dkt. 22 (redacted Request for Extradition). The United States filed its Extradition Memorandum on February 6, 2026. Dkt. 23. Pursuant to the parties' stipulation, (Dkt. 24), Sanabria filed his Opposition to the Government's Extradition Memorandum on April 20, 2026, and the United States filed its Reply on May 19, 2026. Dkt. 26, 27. The Court held a hearing on June 8, 2026, after which it took this matter under submission. Dkt. 28.

## II.    LEGAL STANDARDS

"'Extradition from the United States is a diplomatic process' that is initiated when a foreign nation requests extradition of an individual from the State Department." *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008) (quoting *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005)). "If the State Department concludes that the request is within the scope of a treaty between the requesting nation and the United States," the United States may file a request in federal district court seeking a certificate of the individual's

extraditability. *Id*. The court is authorized by statute to determine whether to certify to the Secretary of State that the evidence submitted by the country requesting extradition is "sufficient to sustain the charge." 18 U.S.C. § 3184. If the court so certifies, the Secretary of State then decides whether the relator should be surrendered to the requesting country. *See* 18 U.S.C. §§ 3184, 3186; *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc).

To issue a certification to the Secretary of State, the court must find: (1) it has jurisdiction to conduct extradition proceedings; (2) it has jurisdiction over the relator; (3) an extradition treaty is in force and effect; (4) the relator is being sought for offenses for which the applicable treaty permits extradition; and (5) there is sufficient evidence to establish probable cause that the relator committed the offense for which extradition is requested. *See Santos*, 830 F.3d at 991.

The judiciary's role in the extradition process is a limited one. *See United States v. Knotek*, 925 F.3d 1118, 1132 (9th Cir. 2019). If the certification requirements are met, "the extradition court must certify the extradition to the Secretary of State, who ultimately determines whether to extradite the accused to the requesting state." *Martinez Santoyo v. Boyden*, 130 F.4th 784, 788 (9th Cir. 2025) (internal alterations omitted); *Manta*, 518 F.3d at 1140. The court "has no discretionary decision to make." *Prasoprat*, 421 F.3d at 1012 (quoting *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997)).

### III.   DISCUSSION

#### A. Subject Matter Jurisdiction

18 U.S.C. § 3184 provides that "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United

8

States" may conduct extradition proceedings and, if the evidence so establishes, issue a certificate of extraditability to the Secretary of State. Central District of California General Order 05-07, in turn, authorizes Magistrate Judges in the District to conduct "[e]xtradition proceedings pursuant to 18 U.S.C. § 3181 et seq." C.D. Cal. General Order 05-07 at 3. Accordingly, this Court has subject matter jurisdiction over this extradition proceeding.

### B. Personal Jurisdiction

This Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (stating a court "may, upon complaint made under oath, charging any person found within [its] jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged"). Sanabria was found within the Central District when he was arrested in Lake Forest, California, on December 3, 2025. Dkt. 6, 8. The Court therefore has jurisdiction over Sanabria.

### C. Valid Extradition Treaty

The Court finds there is a valid extradition treaty in full force and effect between the United States and Peru. The United States filed a copy of the relevant treaty, the Extradition Treaty Between the United States of America and the Republic of Peru, executed in Lima, Peru on July 26, 2001. *See* Dkt. 22-1 at 4-16. Sanabria does not contest that the document represents the current treaty in effect between the United States and Peru.

### D. Sanabria is Sought for an Offense that is Covered by the Treaty

The Court now turns to whether the offense for which Peru has sought Sanabria's extradition is covered by the treaty. "The question of whether an offense is extraditable involves determining: (1) whether it is listed as an extraditable crime in the relevant treaty; (2) whether the alleged conduct is

9

criminalized in both countries; and, (3) whether the offenses in both countries are substantially analogous." *Knotek*, 925 F.3d at 1128-29 (footnote omitted). "In assessing dual criminality, we look first for a similar criminal provision of federal law or, if none, the law of the place where the individual was found or, if none, the law of the preponderance of the states." *Id.* at 1129 n.10. "[T]he elements of the analogous offenses need not be identical." *Clarey v. Gregg*, 138 F.3d 764, 766 (9th Cir. 1998). Rather, it is sufficient that the statutes are "substantially analogous" and "directed to the same basic evil." *Id.* (cleaned up).

Here, the Treaty provides for the extradition of fugitives who were charged or convicted of "an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Dkt. 22-1 at 6. The Northern Lima Court of Appeals convicted Sanabria of Aggravated Murder for Financial Gain, in violation of Section 108 of the Peruvian Criminal Code, and sentenced him to twenty years in prison. Dkt. 22-3 at 8-9, 402-03. As discussed above, in its initial decision and judgment, the Northern Lima Court of Appeals found Sanabria liable as a "mastermind," rejecting that he should be held liable as an "aider and abettor." *Id.* at 396-97. The Supreme Court of Justice subsequently upheld Sanabria's conviction and prison sentence, but found that Sanabria should have been found liable as an "aider and abettor." *Id.* at 547-48. Consistent with the Supreme Court of Justice's instructions, on remand, the Northern Lima Court of Appeals corrected its judgment to reflect Sanabria's liability as an "aider and abettor." *Id.* at 552.

The parties dispute which United States criminal law is comparable to Sanabria's Aggravated Murder conviction under Peruvian criminal law. In its Motion for a Certificate of Extraditability, the United States argued that the

10

comparable offense is homicide under 18 U.S.C. § 1111. Dkt. 23 at 29. In his opposition, Sanabria argues that—in light of the Supreme Court of Justice's ruling—"the more appropriate corollary offense is [1]8 U.S.C. § 2, aiding and abetting homicide." Dkt. 26 at 6. In its reply, the United States argues that it is immaterial whether the comparison is to liability as a principal or as an "aider and abettor" because—under either theory of liability—Sanabria's conduct would be unlawful if it occurred in the United States. Dkt. 27 at 7-8.

The Court agrees with the United States that Sanabria was convicted of an extraditable offense under the Treaty. The Supreme Court of Justice found that the correct characterization of Sanabria's liability, as an "aider and abettor," did not affect the validity of his conviction for Aggravated Murder. Dkt. 22-3 at 547. It also upheld his twenty-year prison sentence. *Id.* Regardless of whether Sanabria would have been charged as a principal or aider and abettor in the United States, he would have faced a potential prison sentence in excess of one year. *See* 18 U.S.C. § 1111(b) (providing that the punishment for murder may include "any term of years," "for life," or in certain circumstances, "death"). *See also* 18 U.S.C. § 2(a) (providing that an offense committed by aider and abettor is "punishable as a principal"). As such, Sanabria was convicted of an offense that it "is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Dkt No. 22-1 at 6.[1]

Sanabria argues that his offense is not extraditable because, under its domestic law, Peru was required to re-authorize its extradition request after the Supreme Court of Justice's decision. Dkt. 26 at 7. Sanabria points to Section 520 of the Peruvian Civil Code, which provides:

If the characterization of the crime that gave rise to extradition was

---

[1] Because there is a federal analog, the Court need not consider California state criminal law. *See Knotek*, 925 F.3d at 1129 n.11.

subsequently modified in the course of the proceedings in the requesting State, it must also be authorized by the Government of Peru, under the same procedures as the previous paragraph, with the specification that it should only be processed if the new characterization also constitutes an extraditable offense.

Dkt. 22-3 at 776. Sanabria argues that the Supreme Court of Justice's decision "modified" the "characterization" of Sanabria's crime in the manner contemplated by Section 520. *See* Dkt. 26 at 7. Because the Northern Lima Court of Appeals first issued a request for Sanabria's extradition on April 6, 2016, before the Supreme Court of Justice's decision, (Dkt. 22-3 at 406-20), Sanabria claims that Peru was therefore obligated to initiate a new request that reflected the Supreme Court's corrected basis for his criminal liability. Dkt. 26 at 7-8.

Even assuming that a violation of Peruvian Civil Code § 520 would violate the Treaty and provide a basis to deny a certificate of extraditability, the Court rejects that Peruvian law required Peru to re-authorize its extradition request for two reasons. First, it is doubtful that Peruvian Civil Code § 520 was triggered by the Supreme Court of Justice's opinion. As discussed above, the Supreme Court of Justice affirmed Sanabria's conviction for Aggravated Murder and his prison sentence. While it corrected the basis for Sanabria's liability, it made clear that the "the factual situation" and "charges against him" are "the same." Dkt. 22-3 at 547. The Supreme Court of Justice's decision therefore did not meaningfully change the "characterization" of Sanabria's conviction and sentence under Peruvian law.

Second, and more importantly, Peru completed all the relevant steps in its extradition process after the Supreme Court of Justice's decision. While the Northern Lima Court of Appeals issued its initial extradition request in 2016, it issued a new request on November 4, 2021, more than three years after the Supreme Court of Justice's decision. *Id.* at 645-50. Approximately two years later, on August 16, 2023, Peru submitted a diplomatic note to the United

12

States formally requesting Sanabria's extradition. Dkt. 22-1 at 2, 18. Amy Lindsay, an Attorney Advisor in the Office of the Legal Adviser for the Department of State, avers that Peru's April 16, 2023, diplomatic note, constituted a "formal[]" extradition request "[i]n accordance with the provisions of the Treaty." Dkt. 22-1 at 2. Thus, each step in Peru's extradition process was undertaken after the Supreme Court of Justice's decision.

The Court therefore rejects that Peru's extradition request was procedurally improper and concludes that Peru seeks Sanabria's extradition for an offense covered by the Treaty.

### E. Probable Cause

The Court next proceeds to determine whether there is probable cause to believe that Sanabria committed the extraditable offense.

An extradition hearing to determine probable cause is "akin to a grand jury investigation or a preliminary hearing under Federal Rule of Criminal Procedure 5.1." *Santos*, 830 F.3d at 991. Under that standard, the court must "consider whether competent legal evidence 'demonstrate[s] probable cause to believe that the accused committed the crime charged' by the foreign nation." *Manta*, 518 F.3d at 1140 (quoting *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984))

"It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate [judge]'s probable cause hearing." *Santos*, 830 F.3d at 991 (quoting *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981)). Rather, "[t]he function of the committing magistrate [judge] is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Id.* at 991-92 (quoting *Collins v. Loisel*, 259 U.S. 309, 316 (1922)). "[C]ourts have emphasized that '[t]he person charged is not to be tried

in this country for crimes he is alleged to have committed in the requesting country' because '[t]hat is the task of the ... courts of the other country.'" *Id.* at 992 (quoting *Eain*, 641 F.2d at 508). "Given the limited nature of extradition proceedings, neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply." *Id.* Evidence may be admitted if it is authenticated and would "be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped." 18 U.S.C. § 3190.

Here, the parties dispute the relevance of Sanabria's conviction in the probable cause analysis. The United States claims that Sanabria's conviction following trial "is dispositive of the issue of probable cause." Dkt. 23 at 30. As the United States observes, courts have generally held that "a foreign conviction obtained after a trial at which the accused is present is sufficient to support a finding of probable cause for the purposes of extradition." *Sidali v. I.N.S.*, 107 F.3d 191, 196 (3d Cir. 1997); *In re Extradition of Hughes*, No. 12-cv-1831-JGB-MLG, 2013 WL 1124294, at *6 (C.D. Cal. Mar. 18, 2013) (holding that "[w]here, as here, the fugitive has already been convicted, the conviction is dispositive of the issue of probable cause" and collecting cases). "The principle that foreign convictions generally constitute probable cause under § 3184 is rooted in comity." *Haxhiaj v. Hackman*, 528 F.3d 282, 290 (4th Cir. 2008). "To hold that such convictions do not constitute probable cause in the United States would require United States judicial officers to review trial records and, consequently, substitute their judgment for that of foreign judges and juries." *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991).

However, as Sanabria argues, (Dkt. 26 at 8)—and the United States does not dispute, (Dkt. 23 at 32)—courts have taken a different approach when the relator was not present for their trial and the conviction was

14

obtained *in absentia*. Some courts "treat *in absentia* convictions as nothing more than charges of criminal wrongdoing, requiring the government to present proof from which the magistrate judge can make an independent assessment of whether probable cause exists." *Haxhiaj*, 528 F.3d at 291 (collecting cases); *see also In re Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1300 (M.D. Fla. 2015) ("When a person is convicted *in absentia*, the judgment is treated as a charge, not a conviction."). Other courts, following the lead of Fourth Circuit's decision in *Haxhiaj*, hold that a probable cause determination can be based on an *in absentia* conviction where the judgment provides a summary of the facts and relevant evidence. *Haxhiaj*, 528 F.3d at 289-92.

It is not clear that Sanabria's conviction properly falls in the *in absentia* line of cases. "Underlying the disparate treatment of a conviction rendered *in absentia* is the notion that 'a trial *in absentia* is not likely to be a fair trial,' affording the accused 'no opportunity to confront the prosecution witnesses or to present a defense' and providing no real 'assistance in ascertaining the probable guilt of the accused.' *Id.* at 291 (quoting Note, *Foreign Trials in Absentia: Due Process Objections to Unconditional Extradition*, 13 Stan. L.Rev. 370, 377 (1961)). Sanabria was present for all the trial hearings in his case, at which he was represented by counsel. *See* Dkt. 22-3 at 218-85. While Sanabria left Peru several days before the Northern Lima Court of Appeals issued its decision finding him guilty of Aggravated Murder, (*id.* at 438), it appears he was present for all the proceedings in which the court considered evidence and argument. He therefore had the opportunity to meaningfully participate in his defense at trial. It is true that Sanabria also was not physically present in Peru during the appellate proceedings in his case, but there is no indication that his appeal was prejudiced by his absence. *See United States v. Perilla Umbarila,* 562 F. Supp. 3d 729, 742 (C.D. Cal. 2022)

("The Superior Tribunal's judgment of conviction was based on the record developed at trial, and therefore, the fact that Perilla Umbarila did not participate in the appellate proceedings does not alter the analysis.") (footnote omitted); *Hughes*, 2013 WL 1124294, at *2 (finding conviction dispositive of probable cause, where the relator's acquittal at trial court level was reversed by Mexican appellate court and the relator had fled "[s]ometime during the pendency of these proceedings"). In fact, in his appeal, Sanabria successfully convinced the Supreme Court of Justice that he was incorrectly found to be the "mastermind" of his sister's murder and to substantially reduce the civil restitution award he owes. *See* Dkt. 22-3 at 547-49.

But even assuming that Sanabria's conviction is not dispositive of the probable cause inquiry, the Court finds that the United States has established probable cause to believe he committed the offense at issue. In reaching this conclusion, the Court is guided by the Fourth Circuit's approach in *Haxhiaj*. There, the Fourth Circuit rejected that the extradition statute "requires the requesting nation to submit underlying trial evidence in support of an *in absentia* conviction." *Haxhiaj*, 528 F.3d at 290. Rather, "in light of the limited nature of the extradition hearing" and comity interests at stake, the Fourth Circuit found it permissible to base a probable cause determination on a foreign court's decision that sets forth the underlying evidence supporting an *in absentia* conviction. *Id.* at 291-92. "*Haxhiaj* has been widely followed" throughout the country, including in this District. *See Perilla Umbarila,* 562 F. Supp. 3d at 742 (collecting cases); *In re Extradition of Camelo-Grillo*, No. 16-cv-9026, 2017 WL 2945715, at *8 (C.D. Cal. July 10, 2017) ("The Court adopts the approach taken by the Fourth Circuit in *Haxhiaj* and other courts, in which an *in absentia* conviction, supported by the court's summary of the evidence presented, may provide probable cause."). Although the Ninth

Circuit has not directly addressed this issue, *Haxhiaj*'s reasoning is consistent with Ninth Circuit authority emphasizing the "limited nature of extradition proceedings" and admissibility of hearsay evidence. *Santos*, 830 F.3d at 992.

In support of its extradition request, Peru submitted the Northern Lima Court of Appeal's decision finding Sanabria guilty of Aggravated Murder and the Supreme Court of Justice's decision upholding his conviction, as well as documents from Peruvian law enforcement's investigation of Sanabria. Dkt. 22-3 at 286-405, 505-50. Both court decisions contain detailed summaries of the evidence submitted at Sanabria's trial. While, as discussed below, Sanabria disputes the significance of some of this evidence, he does not claim that the decisions misrepresent the evidence submitted at trial or are otherwise inaccurate. As such, consistent with *Haxhiaj* and the cases that have adopted its reasoning, the Court considers whether there is probable cause to believe Sanabria committed Aggravated Murder based on the Peruvian courts' summary of the evidence presented at Sanabria's trial.

Based on those decisions, there is ample evidence to support that Sanabria participated in the conspiracy to murder his sister. First, the evidence presented at trial indicates Sanabria had a motive to kill. Sanabria and his sister had a strained relationship, which further deteriorated after she inherited a substantial portion of their mother's estate and returned to Peru to run the San Marcelo school. Witnesses reported that Olga Sanabria frequently fought with Sanabria and Reaño Vásquez, and that she ultimately required Reaño Vásquez resign her position. Following Olga Sanabria's death, Sanabria gained control of the school, re-hired his wife, and substantially increased their income from the school. The evidence thus indicates that Sanabria had personal, financial, and business incentives to kill his sister.

Second, the evidence presented at trial indicated that Sanabria was part

17

of a conspiracy to murder his sister. The prosecution introduced evidence that Sanabria's longtime housekeeper, Mitma, facilitated the hiring of a hitman and provided the hitman with a cellular phone. Cell phone records indicate that the cell phone believed to be used by Mitma contacted the cell phone believed to be used by the hitman shortly before Olga Sanabria's murder. Telephone records also indicate that Mitma and Sanabria had been in regular contact in the weeks preceding the murder, including through a call placed by the telephone believed to be used by Mitma to the telephone believed to be used by Sanabria in the minutes before the murder. The prosecution also introduced evidence that, several weeks before the murder, Sanabria compensated Mitma by extending the payment terms of a substantial loan, valued at approximately $13,800, owed by Mitma's family.

Third, the evidence presented at trial indicated that Sanabria personally took steps to facilitate his sister's murder on the day of the shooting. Sanabria and Reaño Vásquez placed several calls to the principal of the school, who was present with Olga Sanabria, to inquire about details of the event and Olga Sanabria's clothing. Sanabria also called a security guard to request that he assist with a project at a different school campus, leaving the front door to the San Martín de Porres campus unattended.

Sanabria argues that there are "benign explanations" for much of the evidence that prosecutors presented against him at trial. Dkt. 26 at 10. First, Sanabria claims that there is nothing incriminating about the phone calls between Mitma, Sanabria, and Reaño Vásquez because Mitma was a "lifelong friend of the family" and employee. Dkt. 26 at 11. Second, Sanabria rejects any impropriety in the alteration of the payment terms for the loan to Mitma's family, observing that the loan was between Sanabria and Mitma's mother, "it was made public before a notary," and it is "reasonable that a well-to-do

family would be happy to provide needed financial assistance to their lifelong housekeeper." *Id*. at 12. Third, Sanabria argues that the evidence suggests that Olga Sanabria, not Sanabria himself, had requested the security guard leave the school to assist with the project at the other school on the day of her murder. *Id*. at 13.[2] Fourth, Sanabria argues that the reason he did not immediately hand over control of the San Marcelo school, or transfer money, to Olga Sanabria's heirs is because they were minors living in Spain at the time. *Id*. at 13-14.

The Court grants that Sanabria has provided potentially "benign" explanations for some of the evidence presented against him. But the Court need not rule out such benign explanations before finding probable cause. *Cf. D.C. v. Wesby*, 583 U.S. 48, 61 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts"). Rather, "probable cause is established if 'there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty.'" *Perilla Umbarila*, 562 F. Supp. 3d at 741 (quoting *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir. 1988)). The evidence—as summarized by the Northern Lima Court of Appeals and Supreme Court of Justice—easily establish reasonable grounds to believe that Sanabria had a motive and took

---

[2] In support of this argument, Sanabria cites a portion of the Supreme Court of Justice's decision that states the security guard "received the order from the victim to paint the bathrooms." Dkt. 22-3 at 536. However, it appears that this was an error. The remaining parts of Supreme Court of Justice's decision, as well as that of the Northern Lima Court of Appeals, reflect that the evidence presented at trial indicated that Sanabria called the security guard and requested his assistance at a different school. Dkt. 22-3 at 357 ("Defendant also showed particular interest in summoning the security guard of the school, who worked as a doorman and was in charge of maintenance work at the school in San Martín de Porres, so that he could go to the other school located in Callao to help paint it."); *id*. at 366 ("Defendant . . . required the services of the security guard . . . leaving the entrance door unattended"); *id*. at 511 (referencing Sanabria's "request for the service of the security guard").

steps to facilitate his sister's murder. As such, the Court finds probable cause to believe that Sanabria committed the offense for which his extradition is sought.

## IV.   CERTIFICATION

For the foregoing reasons, the Court finds that: there is a valid treaty in force between the United States and the Republic of Peru; the offense for which extradition is sought is covered by the Treaty; and the extradition request contains sufficient probable cause that Edwin Pascual Sanabria de la Torre committed the extraditable offense.

Having found all the requirements for certification of extradition have been satisfied, the Court hereby CERTIFIES the extradition of Edwin Pascual Sanabria de la Torre to the Republic of Peru on the offense for which extradition was sought.

IT IS FURTHER ORDERED that Edwin Pascual Sanabria de la Torre shall remain committed to the United States Marshal pending final decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. § 3186.

IT IS FURTHER ORDERED that the Clerk of the Court shall forward forthwith deliver to the Assistant U.S. Attorney a certified copy of this Order and Certification and forward without delay certified copies of the same to the Secretary of State (to the attention of the Office of the Legal Adviser) and the Director, Office of International Affairs, Criminal Division, U.S. Department of Justice, Washington D.C., for appropriate disposition.

Dated: June 23, 2026

_____
HON. MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE

20